PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-4699 and 11-1099
_____

IN RE:  APPLICATION OF CHEVRON CORPORATION
for
an Order Pursuant to 28 U.S.C. Section 1782 to
Conduct Discovery for Use in Foreign Proceedings
(D.C. # 2-10-mc-00208)


RODRIGO PÉREZ PALLARES and  RICARDO REIS
VEIGA



v.


JOSPEH C. KOHN, ESQUIRE and KOHN, SWIFT &
GRAF, P.C.
(D.C. # 2-10-mc-00209)

Ecuadorian Plaintiffs,

Appellants in No. 10-4699
_____

IN RE:  APPLICATION OF CHEVRON CORPORATION
for

an Order Pursuant to 28 U.S.C. Section 1782 to
Conduct Discovery for Use in Foreign Proceedings
(D.C. # 2-10-mc-00208)

RODRIGO PEREZ PALLARES and RICARDO REIZ
VEIGA

v.

JOSEPH C. KOHN, ESQUIRE and KOHN, SWIFT AND
GRAF, P.C.
(D.C. # 2-10-mc-00209)

*Republic of Ecuador,

Appellant in No. 11-1099

*(Pursuant to Fed. R. App. P. 12(a))
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. # 2-10-mc-00208 and 2-10-mc-00209)
Honorable Jan E. DuBois, District Judge
_____

Argued February 22, 2011

BEFORE:  AMBRO, FISHER, and GREENBERG, Circuit
Judges

(Filed: May 25, 2011)
_____

James E. Tyrell, Jr. (argued)
Adlai J.J. Small
Joseph E. Hopkins
Jason W. Rockwell
Brendan M. Walsh
Patton Boggs, LLP
One Riverfront Plaza, 6th Floor
Newark, NJ 07102

    Attorneys for Appellants Ecuadorian Plaintiffs

Gene C. Schaerr (argued)
Eric W. Bloom
Nicole Y. Silver
Gregory L. Ewing
Winston & Strawn LLP
1700 K Street N.W.
Washington, DC 20006

Jonathan F. Bloom
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
2005 Market Street
Philadelphia, PA 19103

    Attorneys for Appellant Republic of Ecuador

Arthur Makadon

Burt M. Rublin
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Scott A. Edelman
Andrea E. Neuman
Gibson, Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, CA 90067-3026

Randy M. Mastro (argued)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

Thomas H. Dupree, Jr.
John F. Bash
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036

Attorneys for Appellee Chevron Corporation

Andrés Rivero (argued)
Jorge A. Mestre
Paul E. Dans
Catherine C. Grieve
Rivero Mestre LLP
2525 Ponce de Leon Boulevard
Suite 1000

Miami, FL 33134

Frederick A. Tecce
McShea & Tecce
1717 Arch Street
28th Floor, The Bell Tower Atlantic
Philadelphia, PA 19103-0000

Attorneys for Appellee Rodrigo Pérez Pallares

Alan Vinegrad
Jason P. Criss (argued)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

Enrique Armijo
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

Burt M. Rublin
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103

Attorneys for Appellee Ricardo Reis Veiga

James J. Rohn

Patricia M. Hamill (argued)
Matthew H. Haverstick
Conrad O'Brien PC
1515 Market Street, 16th Floor
Philadelphia, PA 19102

<u>Attorneys for Appellees Kohn, Swift & Graf, P.C. and
Joseph C. Kohn, Esquire</u>

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I. INTRODUCTION

This matter comes on before this Court on appeal from the District Court's December 20, 2010 order granting Chevron Corporation (Chevron), and two of its attorneys, Rodrigo Pérez Pallares and Ricardo Reis Veiga (collectively with Chevron "the Chevron applicants"), discovery from attorney Joseph C. Kohn and his law firm, Kohn, Swift & Graf, P.C. (KSG), pursuant to discovery applications that the Chevron applicants filed under 28 U.S.C. § 1782. Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal," subject to the express limitation that "[a] person may not be compelled to give his testimony or statement

or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a).

The underlying foreign litigation giving rise to the section 1782 applications is an environmental class action in Lago Agrio, Ecuador (the Lago Agrio litigation), that the inhabitants of the Oriente region of eastern Ecuador (the Ecuadorian plaintiffs) brought alleging that Texaco Petroleum Company (TexPet), a subsidiary of Texaco, Inc. (Texaco), which merged with Chevron in 2001, contaminated the area and caused significant health problems for its residents. As we explain below, Kohn and KSG have been involved for many years on behalf of the Ecuadorian plaintiffs in the underlying litigation in both legal and financial capacities. The Chevron applicants sought section 1782 discovery for use in the Lago Agrio litigation itself, criminal proceedings arising from TexPet's Ecuadorian activities that have been instituted against Pérez and Veiga[1] in Ecuador, and an arbitration that Chevron initiated against the Republic of Ecuador with the United Nations Commission on International Trade Law (UNCITRAL) pursuant to the United States-Ecuador Bilateral Investment Treaty (BIT).[2]

---

[1] We refer to Rodrigo Pérez Pallares as Pérez throughout this opinion in accordance with his brief, as he is of Spanish descent. We were informed at oral argument that Ricardo Reis Veiga is Brazilian and, being of Portuguese descent, goes by Veiga.

[2] The Ecuadorian plaintiffs are not a party to the BIT arbitration, though they have an interest in the outcome of those

The Ecuadorian plaintiffs and the Republic of Ecuador (collectively "appellants"), both of whom intervened in the District Court in this case, contend that the Court erred in granting the Chevron applicants' section 1782 discovery applications and assert several challenges to the Court's rulings. The Ecuadorian plaintiffs' primary challenge is to the Court's conclusion that, "[t]o the extent that any privilege or immunity from disclosure would otherwise apply to some or all of the discovery sought by Chevron or individual applicants, [Pérez] and Veiga, any such privilege has been waived by public disclosure and does not apply to any documents related to the Lago Agrio Litigation[.]" In re Application of Chevron Corp., Nos. 10-MC-208 and 10-MC-209, 2010 WL 5173279, at *11 (E.D. Pa. Dec. 20, 2010). Specifically, the Ecuadorian plaintiffs contend that the Court misstated the law regarding waiver of the attorney-client privilege, causing it to omit fairness considerations in its analysis, and that consequently its ruling that the attorney-client privilege was waived for all documents in Kohn's file related to the Lago Agrio litigation primarily on the basis of the filming of the documentary Crude, which chronicled the Lago Agrio litigation, was too broad. They also argue "that the presence of strangers" during attorney meetings prevented the privilege from ever attaching to what otherwise might have been privileged information. Ecuadorian plaintiffs' br. at 23. n.7. As will be seen, the "presence of strangers" during attorney meetings being filmed for Crude is the critical factor in the disposition of this appeal. The Republic of Ecuador challenges the District Court's conclusion that it "failed to establish its right to assert the community-of-interest privilege

proceedings.

8

with respect to the documents and deposition testimony sought in this case." In re Application of Chevron Corp., 2010 WL 5173279, at *11. We, however, will have no need to address that issue.

Inasmuch as we hold that the communications filmed for Crude and its outtakes were not covered by the attorney-client privilege when made due to the presence of the filmmakers at the time of the communications, we will reverse the District Court's orders because the public disclosure of non-privileged communications does not lead to a subject matter waiver of the attorney-client privilege for communications covered by the privilege. We, nevertheless, will remand the matter to the District Court so that it may consider the Chevron applicants' contention that certain communications in Kohn's file are discoverable pursuant to the crime-fraud exception to the attorney-client privilege.

## II. FACTS AND PROCEDURAL HISTORY

This is our second encounter with a section 1782 discovery request relating to the Lago Agrio litigation, and because much of the background factual information in this case is the same as that we recounted in our earlier encounter in In re Chevron Corp., 633 F.3d 153 (3d Cir. 2011), we only will outline that background information briefly before setting forth in more detail those facts essential to the resolution of this appeal.

The Ecuadorian plaintiffs initially brought a class action suit against Texaco in 1993 in the United States District Court for the Southern District of New York (the Aguinda case), claiming that pollution from oil exploration and extraction activities had harmed individuals inhabiting the Oriente region of Ecuador and damaged the natural ecosystem in the area. After years of litigation, the court dismissed the Aguinda case in 2002 on forum non conveniens grounds, based in part on Texaco's representations that the Ecuadorian judiciary was impartial and free from corruption and that the Ecuadorian courts could provide a fair and appropriate forum in which to resolve the dispute in the Aguinda case. See Aguinda v. Texaco, Inc., 303 F.3d 470, 474-80 (2d Cir. 2002).

In 2003, after dismissal of the Aguinda case, the Ecuadorian plaintiffs instituted the Lago Agrio litigation against Chevron in Ecuador.[3] On February 14, 2011, shortly before we heard oral argument on this appeal, the Lago Agrio Court issued a comprehensive opinion adjudicating the case and entering judgment in United States dollars against Chevron, calculating the compensatory damages at $8.646 billion. The breakdown of the damages award was as follows: $5.396 billion for soil remediation; $1.4 billion for health care costs; $800 million for deaths due to cancer; $600 million for groundwater remediation; $200 million for damage to the ecosystem; $150 million for drinking water remediation; and $100 million for damages to indigenous culture. The judgment also included a provision

---

[3] The parties in the Aguinda case and the Lago Agrio litigation were not identical.

10

granting an equivalent $8.646 billion in punitive damages payable if Chevron did not issue a public apology within 15 days of entry of the judgment.[4]

Both Chevron and the Ecuadorian plaintiffs have signaled their intent to appeal from the judgment entered in the Lago Agrio litigation. It is our understanding that the Ecuadorian appellate court will exercise de novo review over both the Lago Agrio Court's findings of fact and conclusions of law. Moreover, the Ecuadorian plaintiffs' litigation team produced a memorandum in response to a Chevron section 1782 application in the Southern District of New York seeking discovery from Steven Donziger, the Ecuadorian plaintiffs' lead American attorney, stating that "during the pendency of that appeal, the judgment is not deemed enforceable under Ecuadorian law, and thus, would not appear to be enforceable anywhere else."[5] Chevron Supp. App. II at 480. The Ecuadorian plaintiffs' attorneys' memo further explained that "[b]eyond this initial level of appeal, it is our understanding that Chevron would be required to post an appellate bond equivalent to 100% of the judgment[,]" and for that reason the Ecuadorian plaintiffs' attorneys believe that if the Ecuadorian plaintiffs prevail on the initial appeal, "it seems likely that Chevron will pursue no further recourse in Ecuador." Id.

---

[4] We are not aware whether Chevron has issued a public apology.

[5] Even if the appeals do not stay enforcement of the judgment or the appellate standard of review is not de novo, our result on this appeal would not be different.

As the Lago Agrio litigation progressed, Chevron's opinion of the Ecuadorian courts changed dramatically, and Chevron now contends that the Ecuadorian judiciary is rife with corruption and that a fair trial was not possible in the Lago Agrio litigation. Assessing that its litigation prospects in Ecuador were not promising, correctly as it turned out, on November 23, 2009, Chevron commenced the BIT arbitration against the Republic of Ecuador, seeking a declaration that any judgment the Lago Agrio Court entered would be unenforceable by reason of the judgment having been fraudulently obtained. Furthermore, Chevron asserted that there is corruption within the Ecuadorian judiciary and that the Ecuadorian government interfered in the judicial process in the Lago Agrio litigation.[6] The BIT arbitral panel, which we understand is composed of two private lawyers and a law professor, held a hearing on February 6, 2011, and on February 9, 2011, issued interim measures ordering the Republic of Ecuador to take all measures at its disposal to suspend the enforcement or recognition of any judgment entered in the Lago Agrio litigation both inside and outside of Ecuador. We are unaware of whether the Republic of Ecuador has taken any steps to implement the provisions in the order.

---

[6] Though not a party to the BIT arbitration, the Ecuadorian plaintiffs filed suit in the Southern District of New York seeking a stay of the BIT arbitration. The Republic of Ecuador also moved for a stay of the BIT arbitration, but the district court declined to issue the stay, and the United States Court of Appeals for the Second Circuit has affirmed its ruling on appeal. See Republic of Ecuador v. Chevron Corp., No. 10-1020-cv, -- F.3d --, 2011 WL 905118 (2d Cir. March 17, 2011).

Perhaps regretting its earlier efforts to have the Aguinda case dismissed in the Southern District of New York, Chevron filed a civil Racketeer Influenced and Corrupt Organizations Act (RICO) suit against Donziger and other attorneys that represented the Ecuadorian plaintiffs, though not including Kohn or KSG as defendants, in the Southern District of New York on February 1, 2011. As part of that suit Chevron is seeking a declaration that the Lago Agrio judgment is not entitled to recognition or enforcement outside of Ecuador because the Ecuadorian plaintiffs' attorneys procured the judgment by their fraudulent conduct, and, somewhat ironically given its past representations in the Southern District of New York, because the Ecuadorian legal system is not impartial and does not provide litigants due process of law. On March 7, 2011, the district court in the Southern District of New York granted Chevron's motion for a worldwide preliminary injunction barring the Ecuadorian plaintiffs from enforcing the Lago Agrio judgment. See Chevron Corp. v. Donziger, No. 11 Civ. 0691, -- F. Supp. 2d --, 2011 WL 778052 (S.D.N.Y. March 7, 2011).

During the course of the Lago Agrio litigation Chevron has filed a series of section 1782 discovery applications in federal courts across the United States seeking information related to that litigation and to its contention that the Ecuadorian plaintiffs, through their attorneys, have been involved in fraudulent conduct.[7] Specifically, the Chevron applicants

---

[7] According to the brief of the Republic of Ecuador, the Chevron applicants have submitted "twenty-three similar requests for discovery under 28 U.S.C. § 1782, the Republic has submitted

13

contend that the Ecuadorian plaintiffs and their representatives conspired to ghostwrite reports entered into evidence in the Lago Agrio litigation by purportedly neutral and independent scientists, and also surreptitiously were instrumental in the institution of criminal charges against Pérez and Veiga in Ecuador.

Before instituting these section 1782 proceedings, Chevron sent Kohn and KSG a letter on November 8, 2010, threatening to institute the proceedings against them. Kohn and KSG responded by filing a complaint for declaratory relief in the United States District Court for the Eastern District of Pennsylvania on November 12, 2010, because they perceived that they faced the dilemma of either "choos[ing] not to resist the forthcoming [section 1782] Application and disclos[ing] the materials sought, but risk[ing] suit from its former clients[,]" or "oppos[ing] the Application and withhold[ing] the requested materials, but risk[ing] continued irreparable harm to its reputation as a result of scandalous, totally unfounded, and false allegations of fraud made by Chevron and [Pérez] & Veiga in other § 1782 actions and subsequently repeated in the media." Appellees Kohn's and KSG's br. at 3.

As they said they would do, the Chevron applicants filed

two requests, and the Ecuadorian Plaintiffs have submitted one." Appellant Republic of Ecuador's br. at 3. In our opinion in In re Chevron, we indicated that Chevron had brought at least 25 section 1782 requests. 633 F.3d at 159. Overall, whatever is the correct number of section 1782 applications, this litigation must be unique in the annals of American judicial history.

14

the present section 1782 applications in the Eastern District of Pennsylvania on November 16, 2010, four days after Kohn and KSG filed their declaratory judgment action. The Chevron applicants in their applications sought discovery from Kohn and KSG to support their contentions regarding fraudulent activity in the Lago Agrio litigation. In particular, the applications sought documents in Kohn's file relating to that litigation and also sought an order allowing the Chevron applicants to depose Kohn. Kohn's role in the underlying environmental litigation had been that of an attorney and financier for 16 years, from the inception of the initial class action suit in the Southern District of New York in 1993 until Kohn had a falling out with Donziger in 2009. Indeed, it appears that he and his firm have expended millions of dollars in the prosecution of the Ecuadorian plaintiffs' claims.

After the Chevron applicants filed their section 1782 applications, the District Court placed the Kohn/KSG declaratory judgment action in civil suspense. Kohn did not and does not object to producing the discovery the Chevron applicants are seeking, though he does maintain that if there was a crime or fraud committed in connection with the Lago Agrio litigation, he had no knowledge of or involvement in it.[8] Though Kohn and KSG are not averse to providing the discovery that the Chevron applicants have sought, they took no position in the District Court concerning the propriety of the

---

[8] Kohn's wishes in this respect are immaterial because the attorney-client privilege belongs to the client—in this litigation, the Ecuadorian plaintiffs—and not their attorney. See In re Impounded Case, 879 F.2d 1211, 1213 (3d Cir. 1989).

15

discovery applications or the applicability of any evidentiary privileges. They, however, voluntarily did produce an 833-page privilege log to all of the parties on December 6, 2010, an effort that Kohn and KSG state required "hundreds of attorney hours reviewing and cataloging some 15,000-plus emails, approximately 40,000 pages of hard copy documents, and nearly 5,000 electronically stored documents[.]" Id. at 5. Notwithstanding Kohn's neutral position in the District Court, there was opposition to the Chevron applicants' discovery applications because the Ecuadorian plaintiffs and the Republic of Ecuador intervened in that Court as interested parties and opposed the section 1782 applications. They are the appellants in this appeal.

The evidence the Chevron applicants presented in the District Court in support of their contentions came primarily from discovery that they obtained as a result of successful section 1782 applications they filed in the Southern District of New York, particularly from outtakes during the production of Crude, the documentary chronicling the Lago Agrio litigation. The outtakes were recordings made in the preparation of the final film that were not used in the documentary and were many times longer than the film itself. The Chevron applicants also introduced communications produced by Donziger, the lead American attorney for the Ecuadorian plaintiffs and who initiated the filming of Crude, in response to a prior section 1782 discovery request.[9] Kohn apparently was filmed for Crude

_____

[9] In fact, the district court in the Southern District of New York granted the Chevron applicants nearly unfettered access to all of Donziger's communications related to the Lago Agrio litigation,

16

on three occasions, during and after meetings in Philadelphia on April 10, 2006, June 5, 2006, and January 31, 2007.[10] He appears in the released version of the documentary for less than 2 minutes, and, although we are not certain exactly how long he appears in the 600 hours of Crude outtakes, it is not a significant portion of that time, at least in a temporal sense, and, according to representations made at oral argument before us, likely was less than 2 hours.

Chevron suggests that Kohn's file has communications related to its allegation that support its contention that environmental consultants ghostwrote the global damages expert report that Richard Stalin Cabrera Vega, a purportedly neutral scientific expert, submitted to the Lago Agrio Court (the Cabrera report), and that Kohn financed the work of some of those consultants.[11] Kohn denies that he had any knowledge of or involvement in ghostwriting the Cabrera report. The Chevron applicants also allege that Kohn and the Ecuadorian plaintiffs

in part because he failed to comply with discovery orders issued by that court. See In re Chevron Corp., 749 F. Supp. 2d 170 (S.D.N.Y. 2010).

[10] Kohn claims that he was only filmed for the documentary twice, once in June 2006 and once in January 2007. The exact number of times that Kohn was filmed makes no difference to our outcome.

[11] The Cabrera report was of central importance in our prior opinion relating to the Lago Agrio litigation. See In re Chevron Corp., 633 F.3d 153.

17

surreptitiously were involved in the institution of criminal prosecutions against Pérez and Veiga, which stem from a settlement and release agreement that Texaco entered into with the Republic of Ecuador in the mid-1990s, and contend that documents in Kohn's file will confirm their suspicions. The parties' briefs describe the circumstances leading to the filing of criminal charges against Pérez and Veiga, and so we will synthesize those events, as well as the inferences the parties draw therefrom.

As we have discussed, the Ecuadorian plaintiffs initially filed their environmental contamination case as a class action in the Southern District of New York. While that case was pending, the Republic of Ecuador and TexPet entered into a 1994 Memorandum of Understanding and a 1995 Settlement and Release Agreement whereby TexPet

> agreed to perform specified environmental remedial work in exchange for a release of claims by the Government of Ecuador and Petroecuador. This release, granted to TexPet, Texaco, Inc., and other related companies, encompassed by its terms 'all the Government's and Petroecuador's claims against the Releases for Environmental Impact arising from the Operations of the Consortium[.]'

Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d

334, 342 (S.D.N.Y. 2005). In 1998 the Republic of Ecuador and Petroecuador executed a Final Release certifying that TexPet had performed the required remediation and had met its obligations under the 1995 Settlement and Release Agreement, and that by its terms they released "TexPet and related companies from any liability and claims by the Government of the Republic of Ecuador, PETROECUADOR and its Affiliates, for items related to the obligations assumed by TEXPET in the 1995 Settlement." Id. (internal quotation marks and citation omitted).

The parties dispute the legal impact of the 1998 Final Release. The Chevron applicants argue that it bars the Ecuadorian plaintiffs from making any recovery in the Lago Agrio litigation; indeed, this contention has been one of Chevron's primary arguments in the Lago Agrio litigation, the BIT arbitration, and the Southern District of New York litigation. The Ecuadorian plaintiffs contend, and the Republic of Ecuador agrees, that the Final Release, if valid at all, is valid only against the Republic and that it was not intended to release TexPet from liability for claims by third parties. They point to the fact that the named parties to the Final Release negotiated it while the Aguinda case was pending, and argue that "it is highly unlikely that a settlement entered into while Aguinda was pending would have neglected to mention the third-party claims being contemporaneously made in Aguinda if it had been intended to release those claims or to create an obligation to indemnify against them." Id. at 374. In its opinion accompanying its judgment that we described above awarding the Ecuadorian plaintiffs damages, the Lago Agrio Court expressed an understanding of the Final Release akin to those

19

that the Ecuadorian plaintiffs and the Republic of Ecuador advanced, reasoning that the Final Release only bound the government and not the Ecuadorian plaintiffs.

Whatever may have been the scope of the Final Release, the Ecuadorian Comptroller General in 1997 initiated an audit that continued until 2002, questioning the adequacy of TexPet's remediation, and raising the question of whether Ecuadorian officials and TexPet representatives had committed criminal offenses in certifying the adequacy of the remediation work leading to the execution of the 1998 Final Release. The audit led to a criminal denuncia (complaint) by the Comptroller General's office in October 2003, which, in turn, triggered investigations into determining whether anyone was criminally liable for falsifying documents or committing environmental crimes in connection with the remediation and Final Release. The Prosecutor General of Ecuador began an investigation into the criminal complaint in 2004, but in 2006 the District Prosecutor found that the evidence was insufficient to pursue a criminal case against Pérez and Veiga.

In April 2007, President Rafael Correa, who had been elected President of Ecuador in 2006, issued a press release urging the Office of the Prosecutor to initiate a prosecution of Petroecuador officials who signed off on TexPet's remediation efforts. The following day he added that Chevron-Texaco attorneys involved in any fraudulent conduct also should be prosecuted. On March 31, 2008, a new Prosecutor General reopened the criminal investigations of Pérez and Veiga on the basis of what was claimed to be newly discovered evidence, and the Prosecutor General issued an instrucción fiscal (prosecutor's

investigation report) on August 26, 2008. Part of the criminal investigation of Pérez and Veiga included a June 2009 interview with Cabrera—the court-appointed expert in the Lago Agrio litigation who the Chevron applicants maintain conspired with the Ecuadorian plaintiffs and committed a fraud on the Lago Agrio Court by submitting a purportedly independent global damages assessment that, in actuality, the Ecuadorian plaintiffs ghostwrote—to discuss the remediation work that TexPet performed. In April 2010, the Prosecutor General filed a dictamen fiscal (prosecutor's report), formally charging Pérez and Veiga, along with seven former Ecuadorian government officials, with criminal activity.

The Chevron applicants point primarily to two pieces of evidence that they claim demonstrate that the Ecuadorian plaintiffs colluded with the Republic of Ecuador in a plot to have criminal charges brought against Pérez and Veiga, and contend that the evidence links Kohn and KSG to that effort. First, the Chevron applicants refer to a discussion between Kohn and Donziger from the Crude outtakes on January 31, 2007, in which Donziger tells Kohn that the Ecuadorian plaintiffs' legal team submitted a report to the Ecuadorian Attorney General detailing their findings that Texaco had not completed the remediation work that the 1995 Settlement and Release Agreement required and that the 1998 Final Release said had been done. Second, the Chevron applicants focus on a comment that Kohn made to Donziger in the course of the same discussion when Kohn said: "So, again, that may be something that we could facilitate going away at the right time . . . if [Chevron] wanted it to go away." Appellee Chevron's br. at 22. The parties disagree about what Kohn's reference meant when

21

he made that comment, with the Chevron applicants contending that the comment indicated that an attorney for the Ecuadorian plaintiffs could cause the criminal charges against Pérez and Veiga to disappear in exchange for a settlement with Chevron, and Kohn maintaining that he merely was explaining that the report submitted to the Attorney General could be withdrawn if a settlement was reached, and that Chevron likely would require such a withdrawal as part of a global settlement.

On December 20, 2010, after a hearing during which the attorneys had an opportunity to advance their positions, the District Court granted the Chevron applicants the discovery that they requested in their section 1782 applications, basing its ruling primarily on the Crude outtakes. The District Court found that the factors the Supreme Court in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 124 S.Ct. 2466 (2004), enunciated for consideration in a section 1782 application were not an impediment to discovery in this case. The District Court then considered and rejected claims of privilege that the Ecuadorian plaintiffs raised, ruling that Donziger, in allowing the crew filming Crude intimate access to the proceedings in the Lago Agro litigation, effected a broad subject matter waiver of the attorney-client privilege for all of Kohn's communications related to that litigation. The Court also ruled that the Republic of Ecuador had failed to bear its burden of demonstrating the applicability of the community-of-interest doctrine. Because the Court granted the Chevron applicants discovery of all of Kohn's communications related to the Lago Agrio litigation, it expressly declined to rule on the Chevron applicants' contention that the crime-fraud exception operated to vitiate the attorney-client privilege.

22

Appellants sought a stay of the discovery ruling, but the District Court denied their requests for both a one-week stay and a three-day stay. The Court filed a written amplification of its December 20, 2010 opinion pursuant to Third Circuit Local Appellate Rule 3.1, explaining that time was of the essence[12] because a preliminary hearing on the criminal charges against Pérez and Veiga was scheduled in Ecuador for January 5, 2011.[13] The Court also explained that Pérez and Veiga had presented evidence that the Ecuadorian plaintiffs had some involvement in the initiation of the criminal prosecution against them.

Appellants filed a motion in this Court for a stay pending appeal, or, in the alternative, for a temporary stay pending a hearing on their motion for a stay. We granted a temporary stay on December 22, 2010, and heard oral arguments on the motion for a stay pending appeal on January 5, 2011, after which we granted appellants' motion for a stay pending appeal.

---

[12] The District Court recognized that the Chevron applicants had created some of the time exigency by waiting until November 16, 2010, to file their section 1782 discovery applications.

[13] The criminal preliminary hearing originally had been scheduled for November 10, 2010, and then was rescheduled for January 5, 2011. At the January 5, 2011 oral argument before us on appellants' motion for a stay pending appeal, the parties informed us that the preliminary hearing had been postponed indefinitely. Though it later was rescheduled for March 2, it was postponed yet again, and we are not aware of any new date.

23

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1782, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's decision on a discovery request under section 1782 for an abuse of discretion. In re Chevron Corp., 633 F.3d at 161. "However, if 'the district court misinterpreted or misapplied the law,' or if 'the court relied on inappropriate factors in the exercise of its discretion, our review is plenary.'" Id. (quoting In re Bayer AG, 146 F.3d 188, 191 (3d Cir. 1998)). In this case we are exercising plenary review because we will hold that the District Court erred as a matter of law in granting the section 1782 applications.

## IV. PARTIES' ARGUMENTS

The District Court reasoned as follows in reaching its conclusion that the filming of Crude effected a broad subject matter waiver of the attorney-client privilege for all of Kohn's communications relating to the Lago Agrio litigation:

> [B]y inviting a documentary film crew to attend and record attorney meetings and other events where confidential matters were discussed, the Lago Agrio plaintiffs waived any otherwise applicable privilege or work-product protection for documents related to

24

the Lago Agrio Litigation. The hundreds of hours of footage from the filming of Crude demonstrate that the Lago Agrio Plaintiffs arranged for the filmmakers to attend numerous attorney meetings and gave them broad access to information that would usually be treated as a confidential part of the attorney-client relationship. . . .

The voluntary disclosure by a client of a privileged communication waives the privilege as to other such communications relating to the same subject matter made both prior to and after the occurrence of the waiver. Murray v. Gemplus International, 217 F.R.D. 362, 367 (E.D. Pa. 2003). Under some circumstances, a party making a very limited intentional disclosure is entitled to a fairness balancing test to determine if that the waiver extends to related documents. See, e.g., Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1426 at n. 13 (3d Cir. 1991). The Court concludes, however, that given the truly exceptional scope of

the waiver in this case, the Lago Agrio Plaintiffs are not entitled to such a balancing test. To allow the Lago Agrio Plaintiffs to waive [the] privilege expansively for favorable documents and information as part of a calculated public relations campaign and then shield related documents behind the screen of privilege would be to permit the use of privilege and the work product doctrine as both sword and shield, an abuse that courts have discouraged. See, e.g., Gemplus Int'l, 217 F.R.D. at 367[.]

In re Application of Chevron Corp., 2010 WL 5173279, at *7-8.

As we have indicated, the Ecuadorian appellants make the fundamental contention that "the presence of strangers" during attorney meetings precluded the attorney-client privilege from attaching to what otherwise might be privileged communications. Appellant Ecuadorian plaintiffs' br. at 23 n.7. If that contention is correct, then the communications in the presence of the filmmakers never were privileged and thus there could not have been, in the words of the District Court, a "voluntary disclosure by a client of a privileged communication" and the District Court necessarily erred in reaching its result.

Appellants also contend, relying on the United States Court of Appeals for the Second Circuit's opinion in In re Von

26

Bulow, 828 F.2d 94 (2d Cir. 1987), that the District Court erred in conducting its waiver analysis because it failed to distinguish between the disclosure of communications "made during a judicial proceeding and those disclosures made in an extrajudicial setting." Appellant Ecuadorian plaintiffs' br. at 24. In Von Bulow the court held that "the extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication." Id. at 102. The Von Bulow court reasoned that "disclosures made in public rather than in court—even if selective—create no risk of legal prejudice until put at issue in the litigation by the privilege-holder[,]" and so in such cases "there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed." Id. at 103.

According to appellants, the Ecuadorian plaintiffs and Donziger caused Crude to be filmed for public relations purposes, and not for use in litigation. Indeed, appellants stress that the Chevron applicants, and not appellants, are utilizing Crude and its outtakes in litigation and the Chevron applicants are attempting to gain an advantage from the filming of Crude and its outtakes. Appellants argue that because Crude contained only extrajudicial disclosures not intended to gain any advantage in the Lago Agrio litigation, if there was a public disclosure of privileged communications in the film, the disclosure would not justify a finding that there was a waiver of the attorney-client privilege for all communications in Kohn's file relating to the Lago Agrio litigation. In this regard they point to Von Bulow, in which the court explained that "[a]lthough it is true that disclosures in the public arena may be 'one-sided' or

27

'misleading', so long as such disclosures are and remain extrajudicial, there is no <u>legal</u> prejudice that warrants a broad court-imposed subject matter waiver." <u>Id.</u>

The Chevron applicants argue that the touchstone of a waiver analysis is not whether the beneficiaries of the privilege disclosed the privileged information in court or in an extrajudicial setting, but rather fairness, and that it would be unfair to the Chevron applicants to allow the Ecuadorian plaintiffs selectively to disclose privileged information.[14] Moreover, the Chevron applicants contend that "the very aim of the disclosures Plaintiffs made in <u>Crude</u> was to influence the litigation in Ecuador," Appellees Pérez's and Veiga's br. at 46, and that "the obvious purpose of the film was to gain an advantage in the Lago Agrio litigation by generating public support for Plaintiffs and putting pressure on Chevron to pay a future judgment or to offer a generous settlement." Appellee Chevron's br. at 36. Thus, according to the Chevron applicants,

---

[14] The Chevron applicants claim that appellants abandoned any argument regarding the broad scope of the District Court's privilege ruling because they did not raise the issue in that Court, and also claim that appellants lack standing to challenge that Court's privilege rulings. We reject the Chevron applicants' contentions. The Ecuadorian plaintiffs raised the issue in the District Court, both in their brief and at oral argument. <u>See</u> App. at 1347, 1829, 1863. And, because the Ecuadorian plaintiffs are the clients to whom the privilege belongs, they clearly have standing to challenge the District Court's privilege rulings.

because the Ecuadorian plaintiffs and their representatives selectively disclosed privileged communication to gain a strategic advantage in litigation, the District Court correctly ruled that that disclosure effected a broad subject-matter waiver of all of Kohn's privileged communications relating to the Lago Agrio litigation.

# V. DISCUSSION

## A. The Attorney-Client Privilege and Waiver

The Chevron applicants' arguments, and the District Court's opinion, presuppose that the attorney-client privilege protected the material in Crude and its outtakes from disclosure, for only if there was such a protection could the disclosure of that material waive the attorney-client privilege protecting Kohn's file.[15] Thus, our initial inquiry necessarily is whether

---

[15] We realize that the question of whether the attorney-client privilege protected the material in Crude and its outtakes was raised only obliquely, if at all, in the District Court. Nevertheless, we can consider the question on this appeal, for we long have recognized that we can exercise discretion to consider matters on appeal not raised in a district court "if 'the public interest or justice so warrants[.]'" Galena v. Leone, 638 F.3d 186, 202 n.13 (3d Cir. 2011) (quoting Appalachian State Low-Level Radiation Comm'n v. Pena, 126 F.3d 193, 196 (3d Cir. 1997)). Here we are considering the question of whether the attorney-client

the Crude material was privileged in the first place. In order for the attorney-client privilege to attach to a communication, "it must be '(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'" In re Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000)). We explained with respect to the third requirement in Teleglobe that "if persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach." Id. at 361. Here, the communications captured on film clearly were not made "in confidence" due to the presence of the filmmakers at the time of the communications, and so the protections of the attorney-client privilege never attached to those communications.[16] In such a scenario the

---

privilege protected the material disclosed in the filming of Crude. Unless we do so, we will decide the case incorrectly; if the Crude material was not privileged, revealing the material, including attorneys' discussions, simply could not waive the privilege shielding other material, i.e., the material in Kohn's file.

[16]The Chevron applicants do not contend that the filmmakers should be regarded as "agents" of the Ecuadorian plaintiffs so that the attorney-client privilege could attach to communications in their presence. See Westinghouse Elec. Corp. v. Republic of the Phil., 951 F.2d 1414, 1424 (3d Cir. 1991). Of course, if the filmmakers were "agents" of the Ecuadorian plaintiffs necessary to the litigation, then the disclosure of information to them

30

waiver argument advanced by the Chevron applicants is unavailing because, inasmuch as the communications were not protected by the attorney-client privilege, there was no risk of a litigant using the privilege as both a sword and a shield in an effort to gain an advantage in litigation, and thus there is no role for a court to play as arbiter of notions of "fairness."[17]

would not have been a disclosure to a stranger and the disclosure could not have waived the attorney-client privileges for other material.

[17] Of course, we recognize that in a typical case the difference between a finding that a communication was not privileged in the first place, and a finding that a communication was privileged but that the privilege was waived by subsequent disclosure of that communication to a third party, will be meaningless, because in a typical case a party is seeking to discover the communication in issue, and in either scenario the communication in issue will be discoverable because it is not protected by the attorney-client privilege. Here, however, the Chevron applicants are not seeking to discover the communications in issue, as they already have access to the Crude outtakes as a result of an earlier successful section 1782 application. Rather, the Chevron applicants are attempting to use the Crude outtakes as a means to effectuate a broad subject matter waiver of the entirety of Kohn's communications related to the Lago Agrio litigation. Because the basis for their position is that the Ecuadorian plaintiffs selectively disclosed privileged communications in Crude to gain an advantage in litigation, it matters that the communications in Crude and its outtakes were

31

This case is distinguishable from our prior decision in In re Chevron Corp., 633 F.3d 153. There, the attorney-client privilege covered the communications in issue because they were made in confidence between privileged persons for the purpose of providing legal assistance. We held that by later disclosing those initially privileged communications to a third party—the court-appointed expert Cabrera—the Ecuadorian plaintiffs waived any claims of attorney-client privilege as to those communications. Here, on the other hand, because the communications were not made "in confidence" due to the presence of the Crude filmmakers, they were not privileged to begin with, and there was no privilege to waive by their disclosure. Accordingly, there is no justification for finding any waiver of the attorney-client privilege for Kohn's communications relating to the Lago Agrio litigation on the basis of disclosures made during the filming of Crude and its outtakes, even if those disclosures were selective, given that the communications disclosed were not privileged when made.

For that reason, we are constrained to reverse the District Court's December 20, 2010 order granting the Chevron applicants' application for discovery pursuant to section 1782.[18]

not covered by the attorney-client privilege, because the risk of a party using the privilege both as a sword and a shield by selectively disclosing communications to gain an advantage in litigation simply does not exist when the selectively disclosed communications were not privileged when made.

[18] As far as we can ascertain from their briefs and oral arguments, the Chevron applicants do not present any arguments

Because we will reverse the Court's order granting the applications, it is not necessary for us to address most of the other issues the parties raise on this appeal, including the applicability of the community-of-interest doctrine,[19] and we decline to offer our views with respect to those issues as they would be mere obiter dictum.

## B. The Crime-Fraud Exception

The Chevron applicants maintain, however, that the record provides a sufficient basis to affirm the District Court's determination that there was a broad subject matter waiver of the attorney-client privilege for all of Kohn's communications related to the Lago Agrio litigation on the alternative ground that application of the crime-fraud exception to the attorney-client privilege eliminated the protection of Kohn's communications related to the Lago Agrio litigation. The

---

on appeal in support of their contention that the attorney-client privilege does not cover Kohn's communications relating to the Lago Agrio litigation in addition to their aforementioned waiver contention, which we reject, and the applicability of the crime-fraud exception to the attorney-client privilege, which we address below.

[19] Inasmuch as the communications disclosed were not privileged, it is obvious that we need not address the community-of-interest doctrine, which protects the confidentiality of privileged communications shared by parties with common legal interests against a common adversary. See In re Teleglobe, 493 F.3d at 366.

Chevron applicants assert that if we remand the matter to the District Court for consideration of the crime-fraud exception, the remand will be a waste of time and resources because the District Court already indicated that it believed that the crime-fraud exception to the attorney-client privilege is applicable here. In discussing its decision with the parties on December 20, 2010, following the Court having rendered its opinion after the hearing, the Court stated that

> if an appeal is taken . . . I will consider writing a supplemental opinion on crime fraud, which I don't think the appellants would be very happy with. In other words, I don't think that would, well, I know it would not, in any way, shape or form, change my ruling. It would expand the basis for the ruling and would give the Court of Appeals more, well, more law to analyze, but I don't think that's necessary. Not on the present state of the record, because I think my opinion, based on disclosure to third parties is well founded. I share that with you.
>
> If it is perceived as an attempt to chill an appeal, yes, that's exactly what I have in mind, because I think this litigation ought

34

> to go forward with the discovery
> that the Kohn firm has, I don't want
> to say agreed to, but pretty much
> agreed to.

App. at 1908.

Though the Chevron applicants are correct that the District Court made it clear that it believed that the crime-fraud exception to the attorney-client privilege was applicable to the Kohn communications, the Court ultimately did not rule that the exception applied. In the circumstances, because a determination of whether the crime-fraud exception is applicable is not purely a legal question, but rather requires a fact sensitive inquiry involving the exercise of discretion, we believe that the District Court should consider the crime-fraud exception issue in the first instance and we decline the Chevron applicants' invitation to decide at this time whether the exception is applicable. See Hudson United Bank v. LiTenda Mortg. Corp., 142 F.3d 151, 159 (3d Cir. 1998) (stating that "[w]hen the resolution of an issue requires the exercise of discretion or fact finding," and the trial court did not reach the issue, "it is inappropriate and unwise for an appellate court" to do so in the first instance).

Notwithstanding our determination not to decide whether the crime-fraud exception is applicable, we think it prudent to observe, given the current state of the record and the District Court's comments on December 20, 2010, that it is not clear that the Chevron applicants have met their burden of establishing a prima facie case that the exception is applicable with respect to

35

Kohn's otherwise privileged communications. In this regard, we make the following comments for the District Court to consider on remand.

A party invoking the crime-fraud exception in an attempt to vitiate the attorney-client privilege

> must make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud. A prima facie showing requires presentation of evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.

In re Chevron Corp., 633 F.3d at 166 (quoting In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir. 2006)). Though the Chevron applicants present evidence that they claim demonstrates a fraud or crime in the prosecution of the Lago Agrio litigation, in our prior opinion we clarified that

> evidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception to the

36

attorney-client privilege because to establish the second element of the exception the party seeking to circumvent the privilege by invoking the exception bears the burden of making a prima facie showing that there were communications between the client and attorney in furtherance of that fraud.

Id. at 166-67. In order to make a prima facie showing that the communications they seek from Kohn were made in furtherance of the alleged crime or fraud, the Chevron applicants would have to link Kohn himself to the purported fraud or crime, and so it will be insufficient solely to present evidence that other individuals involved with or representing the Ecuadorian plaintiffs were engaged in a fraud or crime without Kohn's involvement.

The Chevron applicants present two bases for invoking the crime-fraud exception. The first theory is that Kohn was involved in having environmental consultants ghostwrite the Cabrera report that was submitted into evidence in the Lago Agrio litigation. This theory is essentially the same claim that we discussed in our prior opinion in In re Chevron Corp., 633 F.3d 153, although in that case Chevron sought section 1782 discovery from one of the environmental consulting firms and its employees, and here the Chevron applicants seek discovery from Kohn. Consequently, to circumvent the attorney-client privilege with respect to Kohn the Chevron applicants will need

37

to link him to any alleged fraud. Appellants noted at oral argument that the Lago Agrio Court found that there had been no demonstration that there had been fraud committed in the preparation of the Cabrera report, and the court expressly declined to consider the Cabrera report in reaching its judgment. Appellants contended at oral argument that we should give those findings by the Lago Agrio Court preclusive effect, and that the findings bar the Chevron applicants' fraud claims with respect to the Cabrera report.

The Lago Agrio Court wrote the following:

> [A] review of the case file shows that there have been no defects in the appointment of expert Cabrera, or in the delivery of his report. There are no legal grounds whatsoever for quashing either his appointment or his expert report. It should be stressed that this issue has been resolved on several prior occasions, and no new evidence has been submitted that would suggest the existence of any grounds for quashing that appointment or expert opinion.[20]

---

[20] Of course, the Lago Agrio Court wrote its opinion in Spanish, so we are quoting a translation of the opinion.

Appellee Chevron's February 24, 2011 Rule 28(j) letter at 50.[21] But, even though the Lago Agrio Court found that there was no legal basis for excluding the Cabrera report from evidence, it declined to consider the Cabrera report in reaching its judgment. See id. at 51. Furthermore, the Lago Agrio Court issued an order on March 4, 2011, in response to Chevron's motion for clarification and expansion of its initial judgment, in which it reiterated that

> the Court decided to refrain entirely from relying on Expert Cabrera's report when rendering judgment. If [Chevron] feels that it has been harmed because the Court refused to void the entire case against it in response to the alleged fraud in Expert Cabrera's expert assessment, which is allegedly demonstrated by those videos, the Court reminds the defendant that its motion was granted, and that the report had NO bearing on the decision. So even if there was fraud, it could not cause any harm to the defendant. The Court has safeguarded the integrity of the proceeding and the administration

---

[21] We are treating the Lago Agrio Court's opinion as part of Chevron's Rule 28(j) letter, as Chevron supplied the opinion with its letter.

39

of justice.

Appellant Ecuadorian plaintiffs' March 11, 2011 Rule 28(j) letter at 8. We will leave it to the District Court to determine, in the first instance, whether the Lago Agrio Court's findings are entitled to issue preclusive or claim preclusive effect given the surrounding circumstances, and whether the Chevron applicants' claim remains viable inasmuch as the Lago Agrio Court did not consider the Cabrera report in issuing its judgment.

The second theory that the Chevron applicants present to invoke the crime-fraud exception is that Kohn was involved surreptitiously in having criminal charges brought against Pérez and Veiga in an effort to pressure Chevron into settling the case. As we mentioned previously, the Chevron applicants point to a conversation between Kohn and Donziger on January 31, 2007, that was filmed for <u>Crude</u>. In that discussion, Donziger informs Kohn that the Ecuadorian plaintiffs' legal team submitted a report to the Ecuadorian Attorney General detailing its findings that the remediation work that TexPet performed was not completed as required by the 1995 Settlement and Release Agreement and reflected in the 1998 Final Release. However, as Kohn and KSG pointed out in their District Court brief, the Ecuadorian plaintiffs'

> submission of their findings to the Ecuador Attorney General is no different than what Chevron has done recently – turned over

40

> materials it has gathered in the course of its 1782 actions to the United States Department of Justice. . . . Just as the DOJ is free to do whatever it deems appropriate with the information Chevron has provided, the Attorney General of Ecuador was free to do as it thought appropriate with any information provided by plaintiffs.

App. at 1236 n.10.

It is also significant that the Ecuadorian plaintiffs submitted the report to the Attorney General of Ecuador, whose jurisdiction extends only to civil matters, and, although the Attorney General of Ecuador forwarded the report to the United States Department of Justice, it is unclear whether the report ever was submitted to the Ecuadorian Prosecutor General, who has jurisdiction over criminal matters.[22] Likewise, we do not

---

[22] We recognize that on July 31, 2008, Donziger and other representatives of the Ecuadorian plaintiffs held a press conference during which it was commented that they had presented evidence to the Ecuadorian Prosecutor General's office, but it is unclear whether that comment referred to the report mentioned by Donziger in his January 31, 2007 discussion with Kohn, and that report is the only connection that the Chevron applicants have drawn between Kohn and the criminal charges against Pérez and Veiga.

41

view the circumstance to which Perez and Veiga point, that Ecuadorian President Rafael Correa appointed a friend of his as Prosecutor General, and that following this appointment the criminal investigation of Pérez and Veiga was reopened—a fact stressed by counsel for Pérez and Veiga at oral argument—as probative. After all, presidential transitions in the United States also typically include the replacement of high-level officials, oftentimes with persons who are friends, or have an even closer relationship to the incoming president, and it is not uncommon to see a shift in priorities along with a change in the presidential administration.[23] Moreover, it is not uncommon for an American president to comment on ongoing criminal prosecutions and even urge that alleged wrongdoers be prosecuted in accord with the president's priorities.

The Chevron applicants also highlight a comment that Kohn made to Donziger in the course of the same conversation when Kohn said: "So, again, that may be something that we

---

[23] This reality was recognized at a hearing before the Committee on the Judiciary of the United States Senate on July 12, 1968, when Senator Everett M. Dirksen of Illinois commented at length on presidents' appointments of persons to whom he was close to the United States Supreme Court, and said that "[y]ou do not go out looking for an enemy to put him on the Court, or somebody whose views are so divergent that you could not countenance them for a minute." Nominations of Abe Fortas and Homer Thornberry: Hearings Before the Committee on the Judiciary of the United States Senate, 90th Cong. 53 (1968) (statement of Sen. Everett M. Dirksen, Member, S. Comm. on the Judiciary). We doubt that the comment shocked anyone.

could facilitate going away at the right time . . . if [Chevron] wanted it to go away." Appellee Chevron's br. at 22. As we outlined previously, the parties advance differing interpretations of the focus of Kohn's remarks. The Chevron applicants contend that Kohn was referring to an ability to make the criminal charges against Pérez and Veiga disappear in exchange for a settlement agreement with Chevron. Kohn maintains that the statement did not refer to making a criminal investigation or criminal charges go away, but, instead, merely referred to withdrawing the report that the Ecuadorian plaintiffs had submitted to the Attorney General of Ecuador. Kohn states that if a settlement was reached, Chevron likely would require a global settlement that included the cessation of all communications with the Ecuadorian Attorney General. We note that the discussion in issue between Kohn and Donziger was on January 31, 2007, President Correa did not appoint a new Prosecutor General until late-2007, and the criminal investigation into Pérez and Veiga was not reopened until March 2008. Indeed, Pérez and Veiga were not charged with any crimes until 2010, a circumstance which tends to suggest that Kohn was referring to the report, and not to criminal charges that would not issue for another three years. Overall, we are satisfied that inasmuch as the applicability of the crime-fraud exception raises factual issues, we should leave it to the District Court to decide any issues relating to Kohn's statement on remand.

In explaining our analysis of the fraud issue, we acknowledge the seriousness of the fraud that the Chevron applicants have alleged has been involved in this litigation. In addition to an Ecuadorian court entering a massive judgment

43

against Chevron, the liberty of two individuals may be at stake. Yet the circumstances supporting the claim of fraud largely are allegations and allegations are not factual findings. Furthermore, the Chevron applicants are asking that American courts make a finding that the attorneys in a civil case in Ecuador can control the Ecuadorian criminal justice system. Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system. American courts, though justifiably proud of our system, should understand that other countries may organize their judicial systems as they see fit.

## VI. CONCLUSION

Because the presence of the filmmakers prevented the attorney-client privilege from ever attaching to the communications filmed for Crude, there was no basis for finding that the communications effectuated a subject matter waiver of the attorney-client privilege for Kohn's communications related to the Lago Agrio litigation. Consequently, we will reverse the District Court's December 20, 2010 order granting the Chevron applicants' 28 U.S.C. § 1782 discovery applications and will remand the matter for the District Court to consider the parties' arguments regarding the applicability of the crime-fraud exception to the attorney-client privilege.