**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1382**

_____

In Re: HUGO GERARDO CAMACHO NARANJO; JAVIER PIAGUAJE
PAYAGUAJE,

                        Appellants.

--------------------------

CHEVRON CORPORATION,

                        Petitioner – Appellee,

        v.

AARON MARR PAGE; DARIA FISHER PAGE,

                        Respondents – Appellants.

_____

**No. 13-2028**

_____

CHEVRON CORPORATION,

                        Petitioner – Appellee,

        v.

AARON MARR PAGE,

                        Respondent – Appellant,

        and

ECUADORIAN PLAINTIFFS,

                        Parties-in-Interest – Appellants.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:11-cv-01942-RWT; 8:11-cv-00395-RWT)

Argued: March 18, 2014                    Decided: September 24, 2014

Before NIEMEYER, KING, and AGEE, Circuit Judges.

No. 13-1382 dismissed; No. 13-2028 affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge King joined.

**ARGUED:** James Edward Tyrrell, Jr., PATTON BOGGS LLP, Newark, New Jersey, for Appellants. Thomas Henderson Dupree, Jr., GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee. **ON BRIEF:** Christopher J. Gowen, THE GOWEN GROUP LAW OFFICE, PLLC, Washington, D.C., for Appellants Aaron Marr Page and Daria Fisher Page. Richard D. Carter, CARTER & COLEMAN, PLC, Alexandria, Virginia, for Appellants Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Aaron Marr Page, Daria Fisher Page, and Parties-in-Interest - Appellants Ecuadorian Plaintiffs. Peter E. Seley, Claudia M. Barrett, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee.

AGEE, Circuit Judge:

These consolidated appeals stem from a multi-billion-dollar judgment rendered in Ecuador against the Chevron Corporation. Chevron has sought discovery in several American courts to obtain evidence that the Ecuadorian plaintiffs and their lawyers fraudulently obtained that judgment.

In the actions before us, Chevron sought documents from Aaron and Daria Page, two Maryland-based attorneys who assisted Steven Donziger, the lead attorney representing the Ecuadorian plaintiffs. When Chevron subpoenaed documents relating to the Ecuadorian judgment from the Pages, they argued that some of those documents were privileged or protected from disclosure. The district court disagreed and ordered the Pages to produce the requested documents. The Pages, along with two of the original plaintiffs from the Ecuadorian suit, now appeal.

For the reasons that follow, we dismiss appeal number 13-1382 and affirm the district court's judgment in appeal number 13-2028.

I.

"The story of the conflict between Chevron and the residents of the Lago Agrio region of the Ecuadorian Amazon must be among the most extensively told in the history of the American federal judiciary." Chevron Corp. v. Naranjo, 667 F.3d

3

232, 234 (2d Cir. 2012). We provide only small parts of that saga, which relate to matters in the two appeals now before us.

A.

Beginning in 1967, a consortium including Texaco Petroleum Company ("TexPet") and Ecuador's state-owned oil company (now known as Petroecuador) managed oil-drilling operations in Ecuador's Oriente region. TexPet managed the consortium until 1990, when it transferred operational control to Petroecuador. TexPet sold its interests two years later.

Shortly after TexPet's withdrawal from Ecuador, a group of Ecuadorian plaintiffs sued TexPet's parent corporation, Texaco, Inc., in the Southern District of New York in 1993. See Aguinda v. Texaco, Inc., 303 F.3d 470, 473 (2d Cir. 2002). The Aguinda plaintiffs alleged that TexPet's operations had "polluted the rain forests and rivers in Ecuador," id., by "dump[ing] large quantities of toxic by-products of the drilling process into the local rivers, . . . burning them, dumping them directly into landfills, and spreading them on the local dirt roads," Jota v. Texaco, Inc., 157 F.3d 153, 155 (2d Cir. 1998).

While Aguinda was pending, TexPet signed a 1994 settlement agreement with the Government of Ecuador and Petroecuador ("the Settlement Agreement"). Under that agreement, TexPet agreed to perform environmental remediation work in the Oriente region. See In re Chevron Corp., 650 F.3d 276, 284 (3d Cir. 2011). In

4

exchange, the Government of Ecuador and Petroecuador agreed to release TexPet and Texaco from claims relating to the consortium's "environmental impact." Id. In 1998, Petroecuador and the Government of Ecuador executed a release stating that TexPet had fulfilled its duty to remediate under the Settlement Agreement.

Meanwhile, "the [New York] court dismissed the Aguinda case in 2002 on forum non conveniens grounds," id., and a group of largely the same Ecuadorian plaintiffs refiled their suit against Chevron in Ecuador in 2003.[1] This suit became known as the "Lago Agrio" litigation, while the 47 plaintiffs in the suit are commonly termed "the Ecuadorian Plaintiffs" or, sometimes, the "Lago Agrio Plaintiffs." Steven Donziger, an American attorney who had earlier been involved in Aguinda, assumed primary control as lead counsel in the Lago Agrio suit for the Ecuadorian Plaintiffs.

In 2011, the Ecuadorian Plaintiffs obtained an $18.2 billion judgment against Chevron in the Ecuadorian court.[2] The

---

[1] In 2001, Texaco merged with a subsidiary of Chevron, "with Texaco emerging as the surviving entity." Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 391 (S.D.N.Y. 2014). "Chevron thereby became the indirect owner of all of Texaco's common stock" through its subsidiary entity. Id.

[2] Ecuador's highest court later halved that figure, in effect ordering remittitur, but Chevron remains subject to a $9 billion judgment.

5

judgment recited that TexPet had caused damage to the local environment, culture, and health; it further held that Chevron was responsible for that damage as Texaco's successor-in-interest. Chevron has since exhausted its appeals in Ecuador, but the Constitutional Court of Ecuador has agreed to consider an extraordinary action seeking further review of the judgment.

B.

Several years after the Lago Agrio litigation was filed, Chevron initiated arbitration proceedings against the Government of Ecuador before the Permanent Court of Arbitration at The Hague, Netherlands. See Republic of Ecuador v. Hinchee, 741 F.3d 1185, 1187 (11th Cir. 2013). Chevron alleged that the Ecuadorian government had violated the Ecuador-United States Bilateral Investment Treaty in several ways relating to the Lago Agrio litigation. First, Ecuador had not indemnified Chevron as the Settlement Agreement required. Id. Second, Ecuador had failed to notify the Ecuadorian courts that Chevron was released from liability in the Lago Agrio litigation under the Settlement Agreement. Id. And third, the Ecuadorian government had improperly interfered in the Lago Agrio proceedings on behalf of the plaintiffs. Id. The arbitration proceeding is ongoing at The Hague.

6

C.

The TexPet release aside, Chevron also contends that the Lago Agrio proceedings were a fraud that Donziger and others orchestrated. For instance, Chevron alleges that Donziger's litigation team ghostwrote expert reports from Richard Cabrera, an "impartial," court-appointed damages expert. Later, Donziger and his associates are alleged to have commissioned a series of "cleansing memos" -- purportedly independent reports buttressing or "cleansing" Cabrera's findings that were actually based on the same fraudulent data. Similarly, Chevron contends that the Ecuadorian Plaintiffs' attorneys forged an expert report from Dr. Charles Calmbacher, one of their own experts. Donziger and his team then purportedly bribed the Ecuadorian trial judge who authored the Lago Agrio judgment, offering $500,000 to the judge in exchange for a favorable outcome. According to Chevron, Donziger and his associates then wrote the final judgment award, placing large verbatim portions of their own internal documents into the final opinion.[3]

Chevron maintains that the Pages, who worked for Donziger during the Lago Agrio litigation, directly involved themselves in this fraud. For example, Chevron contends that the Pages

_____

[3] As noted below, after oral argument in this case, a district court in New York concluded that many of Chevron's allegations against Donziger were true. See generally Chevron Corp. v. Donziger, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).

7

developed certain extortion strategies meant to pressure Chevron into settling, such as instigating a bogus Securities and Exchange Commission investigation, accusing Chevron of committing genocide, and claiming that Chevron violated the Foreign Corrupt Practices Act. The Pages also allegedly contrived an entirely unsubstantiated damages estimate. And most importantly, the Pages are said to have written (or at least helped to write) "the Draft Alegato" and "the Fusion Memo," two internal documents that were then partially incorporated verbatim into the Ecuadorian court's final judgment.

D.

To help establish its fraud and arbitration related claims, Chevron sought discovery in the United States. By one court's count, Chevron brought "at least 25 [early] requests to obtain discovery from at least 30 different parties." Chevron Corp., 633 F.3d at 159.

Chevron made these discovery requests under 28 U.S.C. § 1782, which empowers federal district courts to order persons "to give testimony or produce documents for use in a proceeding in a foreign or international tribunal."[4] Intel Corp. v.

_____

[4] Any "interested person" may apply to a district court to obtain documents or testimony from another person "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. (Continued)

8

Advanced Micro Devices, Inc., 542 U.S. 241, 246 (2004) (quotation marks omitted). Chevron planned to use the discovery in the ongoing international arbitration proceedings and the pending Ecuadorian appellate proceedings.

In a § 1782 proceeding in the Southern District of New York, Chevron sought to compel Donziger to produce certain documents and submit to a deposition. Donziger moved to quash, arguing in part that the subpoenaed documents were privileged -- particularly under the attorney-client and work-product privileges. Donziger, however, failed to file a privilege log when he raised these objections.

Because Donziger failed to file a privilege log, the New York district court determined on October 20, 2010 -- in a decision termed "the Donziger Waiver" -- that Donziger had waived any of the privileges that he claimed. See In re Application of Chevron Corp., 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010). Nonetheless, the district court afforded Donziger a

---

§ 1782(a). In deciding whether to grant the application and allow a subpoena to issue under the statute, the district court considers several factors identified in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 246 (2004). This initial application process often occurs ex parte, though it did not in this case. See, e.g., In re Republic of Ecuador, No. C-10-80225 MISC CRB (EMC), 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010) (listing cases). Once the application is granted and the subpoena is issued, the subpoena target can move to quash it. Id.

9

chance to cure his waiver by filing a privilege log by a court-specified deadline. Id. at 140 n.17. Donziger failed to do so. In a subsequent decision on Donziger's motion for reconsideration, the court then reaffirmed that "any claims of privilege with respect to the documents sought by the subpoena were waived." In re Chevron Corp., 749 F. Supp. 2d 170, 182 (S.D.N.Y. 2010). The court ordered Donziger to produce "each and every document responsive to the subpoenas (irrespective of whether any privilege or other protection against disclosure has been or hereafter is or may be claimed)." Id. at 188. In so holding, the court stressed that Donziger had deliberately delayed the § 1782 proceeding with unsubstantiated privilege claims as a litigation strategy. See, e.g., id. at 185 ("[T]he failure to submit a privilege log . . . was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay.").

The Second Circuit affirmed the Donziger Waiver, "substantially for the reasons stated by the [d]istrict [c]ourt." Lago Agrio Plaintiffs v. Chevron Corp., 409 F. App'x 393, 395 (2d Cir. 2010). It further commended the "exemplary manner in which the able District Judge ha[d] discharged his duties." Id.

10

E.

Chevron later sued Donziger, the Ecuadorian Plaintiffs, and others in the Southern District of New York in February 2011. Chevron's nine-count complaint asserted claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act and certain New York statutes.

After a bench trial, Chevron obtained a favorable judgment. The district court concluded that Donziger "and the Ecuadorian lawyers he led [had] corrupted the Lago Agrio case" in a variety of ways, including fabricating evidence, coercing judges, and bribing judicial officials. Donziger, 974 F. Supp. 2d at 384. Accordingly, the district court enjoined Donziger and the other defendants in the New York action from enforcing the Lago Agrio judgment in the United States. Donziger, his law firm, and two of the Ecuadorian Plaintiffs have appealed that decision to the Second Circuit; that appeal remains pending.[5]

F.

With the above background in mind, we move to the two appeals before us, which involve separate sets of subpoenas: one set issued under § 1782 (in connection with the Hague arbitration and Ecuadorian appellate proceedings) and the other

---

[5] The district court denied their motion to stay pending appeal, and no stay was requested from the Second Circuit.

11

under Federal Rule of Civil Procedure 45 (in connection with Chevron's New York suit).

### 1.

Pursuant to Rule 45, Chevron issued a pair of subpoenas to Aaron and Daria Page on May 20, 2011 in the District of Maryland.[6] The subpoenas, issued here as an ancillary proceeding related to Chevron's lawsuit in the Southern District of New York, each included 33 different document requests relating to the Lago Agrio litigation and its surrounding circumstances.

Although the Pages provided responses, objections, and some partial productions in June 2011, Chevron contended that these responses were inadequate. Chevron then moved in the District of Maryland to compel production, arguing that the Pages had inappropriately asserted privilege -- primarily attorney work-product privilege -- over some of the responsive documents. The

---

[6] Under former Rule 45(a)(2), "a subpoena for production or inspection [was to] issue from the court for the district in which the production or inspection is to be made." Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 2 F.3d 1397, 1406 (5th Cir. 1993). Accordingly, "a federal court sitting in one district [could not] issue a subpoena duces tecum to a non-party for the production of documents located in another district." Id. For that reason, Chevron came to the District of Maryland to obtain the Pages' Maryland-based documents. The Federal Rules of Civil Procedure were amended in December 2013 so that all subpoenas now issue from the court where the underlying action is pending. See Fed. R. Civ. P. 45(a)(2) ("A subpoena must issue from the court where the action is pending.").

Pages and two Ecuadorian Plaintiffs, Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, opposed Chevron's motion.

On August 31, 2011, a Maryland magistrate judge granted Chevron's motion to compel, concluding that the Pages' asserted privileges did not apply for several reasons. Of particular relevance, the magistrate judge determined that the Donziger Waiver acted to waive any privileges that applied to the Pages' documents.[7] The Donziger Waiver reached any "legal work and privilege claims associated with Mr. Donziger," and it made "no difference" that the Pages (rather than Donziger) physically possessed the documents given that they all worked on the same legal team for the same clients in the same proceedings. (J.A.1 1584-85.)[8]

---

[7] The magistrate judge identified two other bases for its ruling. First, the Ecuadorian Plaintiffs' attorneys had waived any applicable privileges by making voluntary disclosures to third parties, including Cabrera. And second, the crime-fraud exception defeated any privileges or protections that the Pages claimed. According to the magistrate judge, Chevron presented sufficient evidence of fraud "if for no other reason than [that] . . . documents co-authored by the Pages . . . [had] found [their] way into the decision in [the] Ecuadorian court." (J.A.1 1591.) In addition, "there [wa]s a lot of other information that [Chevron] ha[d] provided to support the notion that there [was] fraudulent activity." (J.A.1 1592.)

[8] We cite the joint appendix filed in appeal number 13-1382 as "J.A.1" and the joint appendix filed in appeal number 13-2028 as "J.A.2."

Thus, in September 2011, the Pages produced the documents over which they had asserted privilege -- but the production proved temporary. On September 20, 2011, for reasons not relevant here, the Second Circuit effectively stayed discovery in the New York action.[9] A few days later, the Maryland district court responded by staying the Maryland magistrate judge's discovery order and administratively closing the Maryland Rule 45 discovery proceeding. It further ordered Chevron to return or destroy the Pages' documents.

However, several months after discovery in the New York proceeding was completely stayed, the New York district court lifted its stay and permitted discovery to go forward on all remaining counts in that case. In response, in January 2013, the Maryland district court lifted its own stay in the Rule 45 proceeding and instructed Chevron to respond to objections to the magistrate judge's decision, which the Pages, Naranjo, and Payaguaje had previously filed. One month later, the district

---

[9] After issuing a preliminary injunction order pertaining to count nine of Chevron's complaint, the New York district court on April 15, 2011 bifurcated that count from the remaining counts and stayed all discovery except discovery relevant to count nine. Two weeks after that, on May 31, the New York district court formally severed count nine into a separate action, which the parties call Chevron v. Salazar. On September 20, 2011, the Second Circuit stayed discovery on count nine. The combined effect of these orders was to stay all discovery in the New York proceedings at that time.

14

court overruled the objections and ordered the Pages to produce the documents again.

The Pages, Naranjo, and Payaguaje all timely appealed.[10]

2.

In November 2011, while discovery pertaining to Chevron's New York suit was stayed, Chevron filed a § 1782 application in the District of Maryland again seeking discovery from the Pages. As it did in its other § 1782 applications, Chevron explained that the discovery was needed as part of its Ecuadorian appeals and the arbitration proceeding at The Hague. The application included all 33 of the requests included in the Pages' Rule 45 subpoenas.[11] The Pages, joined by Naranjo and Payaguaje, again asserted privileges from disclosure as to some of the responsive documents.

In January 2013, the magistrate judge ordered the Pages to turn over the documents that they possessed. As he did in the prior Rule 45 decision, the magistrate judge cited alternate, independent grounds, including the Donziger Waiver, in

---

[10] Chevron later asked the district court to hold Aaron Page in contempt, contending that Page continued to fail to produce responsive documents. The magistrate judge ordered Page to make further productions but did not hold him in contempt.

[11] The parties treat the § 1782 subpoenas as equal in scope to the Rule 45 subpoenas. (See, e.g., Opening Br. [13-2028] 13-14 (comparing scope of subpoenas).)

15

determining that any privileges applicable to Page's documents had been waived.[12]

Over objection, the district court affirmed the magistrate judge's decision in a July 16, 2013 order. Aaron Page, Naranjo, and Payaguaje timely appealed.[13]

## II.

To address the merits of these appeals, we must first be assured that we have jurisdiction to hear them. See United States v. Wilson, 699 F.3d 789, 793 (4th Cir. 2012) ("[S]ubject matter jurisdiction must . . . be decided before any other matter."). Both appeals present complicated questions concerning our jurisdiction and involve unique procedural postures. They also could stand in tension with the rule that "[d]iscovery orders are inherently interlocutory and typically

---

[12] Once again, the magistrate judge relied on two other separate and alternate bases: the waiver through disclosure to Cabrera and the crime-fraud exception. The magistrate judge also expounded upon his fraud findings, concluding that "Chevron ha[d] shown to anyone with common sense that [the Ecuadorian judgment was] a blatant cut and paste exercise." (J.A.2 2632.) Furthermore, Chevron had provided sufficient evidence to void any claimed privilege of three other instances of fraud: the forged Calmbacher expert report, the ghostwritten Cabrera "impartial" expert report, and the cleansing memos.

[13] Chevron moved to hold Aaron Page in contempt in the § 1782 proceeding as well. Here again, the magistrate judge ordered Page to make further productions but did not hold him in contempt.

not appealable." Nicholas v. Wyndham Int'l, Inc., 373 F.3d 537, 541 (4th Cir. 2004) (quotation marks omitted).

Having considered our subject matter jurisdiction, we conclude that we lack jurisdiction in one appeal, number 13-1382 (the Rule 45 proceeding), but have jurisdiction in the other, number 13-2028 (the § 1782 proceeding).

A.

We first examine the appeal from the district court's decision regarding Chevron's Rule 45 subpoenas. Plainly, we are the court that must hear any appeal from the Maryland district court's decisions as to these subpoenas. Although the Rule 45 subpoenas issued in connection with a proceeding in the Second Circuit, that Court of Appeals does not have jurisdiction over the district courts in the Fourth Circuit. Only we may review a discovery order entered in the District of Maryland. See 28 U.S.C. § 1294(1) (explaining that appeals from district courts generally must be taken "to the court of appeals for the circuit embracing the district").

Nonetheless, we may "review only final decisions of district courts." Noohi v. Toll Bros., Inc., 708 F.3d 599, 604 (4th Cir. 2013) (quotation marks and alteration omitted). Final orders are "those that end the litigation on the merits and leave nothing for the court to do but execute the judgment." McCook Metals LLC v. Alcoa, Inc., 249 F.3d 330, 334 (4th Cir.

17

2001) (quotation marks and alteration omitted).  This "pragmatic rule" carries out the "twin purposes" of "avoiding the enfeebling of judicial administration that comes with undue delay . . . and preserving the primacy of the district court as the arbiter of the proceedings before it."  GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 176 (4th Cir. 2007) (quotation marks and alteration omitted).

Discovery decisions "bespeak their own interlocutory character," as they constitute "only a stage in the litigation and almost invariably involve no determination of the substantive rights involved in the action."  MDK, Inc. v. Mike's Train House, Inc., 27 F.3d 116, 119 (4th Cir. 1994).  Ancillary discovery proceedings granting discovery are no different.  We have often (and perhaps usually) declined to permit immediate appeals in such actions, particularly where the party from whom discovery is sought is not a party to the primary underlying action.  See Nicholas, 373 F.3d at 541 ("We have held that the collateral order doctrine does not authorize appeal from an order granting discovery from a nonparty in an ancillary proceeding." (emphasis in original)); MDK, Inc., 27 F.3d at 120–22 (dismissing appeal for lack of jurisdiction where non-party sought review of order that granted discovery in ancillary proceeding related to out-of-circuit underlying proceeding).  This is just such an ancillary action, as Chevron seeks its Rule

18

discovery from two non-parties -- the Pages -- in aid of an underlying action in the Southern District of New York. Our cases hold that a non-party who wishes to appeal from an order granting discovery should "resist [the discovery] order, be cited for contempt, and then challenge the propriety of the discovery order in the course of appealing the contempt citation." MDK, Inc., 27 F.3d at 121. The Pages, however, have not taken that route.

Instead, the Pages, Naranjo, and Payaguaje argue that we should find jurisdiction under the so-called Perlman exception, which has sometimes been applied to permit an appeal from "a discovery order directed at a disinterested third party."[14]

---

[14] There is a substantial question as to whether Perlman is applicable here -- for several reasons. For one, we have never explicitly held that Perlman applies to ancillary proceedings. The parties have not cited a particular case applying Perlman in an appeal from an ancillary proceeding involving a non-party, and we know of none. For another, Perlman may no longer provide a viable rule in light of the Supreme Court's more recent decision in Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100, 103 (2009). In that case, the Supreme Court held that "disclosure orders adverse to the attorney-client privilege" were not immediately appealable under the collateral order doctrine because "[p]ostjudgment appeals, together with other review mechanisms, suffice to protect [the privilege]." 558 U.S. at 103. Some courts have suggested that Mohawk's limited view of privilege-related appeal rights is inconsistent with Perlman. See United States v. Copar Pumice Co., Inc., 714 F.3d 1197, 1207-08 (10th Cir. 2013) (describing cases that note tension between Mohawk and Perlman). Mohawk might be read to say that interlocutory appeals concerning the discovery of privileged documents should not be permitted when the privilege-holder has other means to protect his privilege rights. See (Continued)

19

<u>Church of Scientology of Cal. v. United States</u>, 506 U.S. 9, 18 n.11 (1992) (citing <u>Perlman v. United States</u>, 247 U.S. 7 (1918)). That type of discovery order is "immediately appealable" because "the third party presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance." <u>Id.</u>; <u>see also</u> <u>In re Pruett</u>, 133 F.3d 275, 281 n.10 (4th Cir. 1997) (explaining that an uninvolved third party has "little or no incentive to risk contempt" by resisting a discovery order); <u>Eastland v. U.S. Serviceman's Fund</u>, 421 U.S. 491, 514 (1975) (Marshall, J., concurring) (stating that a "neutral third party" could not be expected to risk contempt).

Assuming -- but not deciding -- that the <u>Perlman</u> exception could be applied here, it nonetheless fails to establish subject

---

<u>Mohawk</u>, 558 U.S. at 109, 113 (noting that post-judgment appeals, petitions for writs of mandamus, and motions seeking certification under Federal Rule of Civil Procedure 54(b) or 28 U.S.C. § 1292(b) mitigate the need to permit an interlocutory appeal). The Pages did not pursue a mandamus petition or a certification motion. Lastly, we note that the Pages have already turned over their privileged documents. Yet "[t]he premise of an interlocutory appeal in a case such as <u>Perlman</u> . . . is that the holder of the information has yet to comply with the order. Interlocutory review permits a decision before the cat is out of the bag." <u>Wilson v. O'Brien</u>, 621 F.3d 641, 643 (7th Cir. 2010). It strikes us as odd, then, that the appellants would invoke an exception principally meant to avoid "letting the cat out of the bag" when the Pages have already done just that. In the end, we need not definitively resolve these doubts because, as explained below, we find that <u>Perlman</u>'s requirements have not been met in this case -- even assuming that the exception may be invoked in a case like this one.

20

matter jurisdiction because the appellants do not meet its requirements.

The Pages may not rely upon <u>Perlman</u>, as <u>Perlman</u> does not permit an appeal by the subpoena-target. Rather, <u>Perlman</u> has come to mean that a privilege-holder may step in and appeal when a disinterested subpoena target is about to relinquish the privileged documents. <u>See, e.g.</u>, <u>United States v. Under Seal</u>, 748 F.2d 871, 873 n.2 (4th Cir. 1984) ("[W]hen the one who files the motion to quash, or intervenes, is not the person to whom the subpoena is directed, and the movant or intervenor claims that production of the subpoenaed documents would violate his attorney-client privilege, the movant or intervenor may immediately appeal."). In other words, <u>Perlman</u> has permitted a privilege-holder to move into the appeal in the subpoena-target's place. <u>See, e.g.</u>, <u>In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001</u>, 490 F.3d 99, 106 (2d Cir. 2007) ("[T]he <u>Perlman</u> exception is relevant only to appeals brought by the holder of a privilege where the disputed subpoena is directed at <u>someone</u> <u>else</u>." (emphasis in original)); <u>Application of Am. Tobacco Co.</u>, 866 F.2d 552, 556 (2d Cir. 1989) ("<u>Perlman</u> may not be extended to permit the party in possession of the subpoenaed documents to appeal prior to contempt simply because other persons might have been able to do so."). Conversely, subpoena-targets in an ancillary proceeding, like the Pages, must follow

21

the path that we have already described: they "must either obey its commands or refuse to do so and contest the validity of the subpoena if [they are] subsequently cited for contempt on account of [their] failure to obey." United States v. Ryan, 402 U.S. 530, 532 (1971).

Although the Pages may not invoke Perlman, that does not resolve whether the ostensive privilege-holders, Naranjo and Payaguaje, may use the doctrine to establish jurisdiction for their appeal. After all, privilege-holders may invoke the Perlman exception if the subpoena-targets are truly disinterested. On the other hand, Naranjo and Payaguaje cannot invoke Perlman as a jurisdictional ground for their appeal if the Pages are not truly disinterested.

We have deemed attorneys disinterested in some prior cases. See, e.g., In re Grand Jury Subpoena, 341 F.3d 331, 334 n.2 (4th Cir. 2003); In re Grand Jury Subpoena, 836 F.2d 1468, 1470 n.2 (4th Cir. 1988). The appellants suggest that we have adopted a blanket rule that "counsel -- whether current or former -- [are] indeed within the Perlman sphere."[15] (Appellants' Supp. Br. 3.)

---

[15] The opinion that they cite in support, In re Special Grand Jury No. 81-1 (Harvey), 676 F.2d 1005, 1008 (4th Cir. 1982), was later withdrawn, In re Harvey, 697 F.2d 112, 112 (4th Cir. 1982). "Once vacated, Harvey lost precedential value within this circuit." In re Grand Jury Matter, 926 F.2d 348, 350 (4th Cir. 1991). At argument, counsel for the Ecuadorian Plaintiffs also invoked Potomac Electric Power Co. v. Leavitt, (Continued)

22

We disagree; our cases do not take that kind of categorical approach. And in fact, we would very likely err in doing so, as lawyers and their clients often share substantial interests that sometimes keep the attorneys from being truly "disinterested." Church of Scientology, 506 U.S. at 18 n.11. "[A]ttorneys assume an ethical obligation to serve their clients' interests[,] . . . [and] [t]he effective congruence of interests between clients and attorneys counsels against treating attorneys like other nonparties for purposes of appeal." Cunningham v. Hamilton Cnty., 527 U.S. 198, 207 (1999).

On this record, we see at least three reasons to conclude that the Pages are not "disinterested" in the Perlman sense.

First, the Pages have asserted their own "privilege,"[16] arguing that the subpoenaed documents are protected work product. The attorney, however, holds the work product privilege along with the client. See, e.g., Solis v. Food

_____

142 F. App'x 154, 157 n.5 (4th Cir. 2005), but that opinion is unpublished and of no precedential weight.

[16] We recognize that the work product doctrine is not a privilege but rather "a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." In re Perrigo Co., 128 F.3d 430, 437 (6th Cir. 1997). We refer to the privilege only as a shorthand way of referring to the doctrine's protection –– and because parties (and indeed, this Court) so often refer to the doctrine as a "privilege."

23

Emp'rs Labor Relations Ass'n, 644 F.3d 221, 231 (4th Cir. 2011).

"Where the petitioner asserts its own interests in the work product, it has the requisite incentives to risk contempt." In re Flat Glass Antitrust Litig., 288 F.3d 83, 90 n.9 (3d Cir. 2002) (quotation marks omitted).[17]  In other words, the Pages have put their own interests in play, so it is reasonable to expect the Pages to defend them.

Second, the Pages have evidenced a willingness to face a contempt sanction.  A party might be entitled to invoke Perlman if that party "is able to prove that the subpoenaed party will comply with an order enforcing the subpoena . . . regardless of whether the subpoenaed witness is a current attorney, is a former attorney, or has some other relationship with the interested party." In re Grand Jury Proceedings, 616 F.3d 1172, 1180 (10th Cir. 2010).  But the appellants here have not tendered proof of that nature.  In fact, Aaron Page has recently litigated a contempt sanction in the district court in this proceeding, which directly arose from his failure to comply with Chevron's subpoena.  We view this contempt contest as one of the

---

[17] As then-Judge (now Justice) Ginsburg explained, "the work product doctrine protects interests held by both the attorney and the client[,] . . . [so] counsel has a double incentive to preserve appellate review of the work product claim." In re Sealed Case, 655 F.2d 1298, 1301 (D.C. Cir. 1981); accord In re Sealed Case, 141 F.3d 337, 340 (D.C. Cir. 1998).

24

surest signs that the Pages will not simply produce all the documents to avoid a sanction.

And lastly, we cannot ignore this case's broader context. The subpoenaed party is more likely to risk contempt where "he has either a particularly close relationship to the putative privilege-holder or a personal interest in nondisclosure of the material." In re Grand Jury Proceedings, 832 F.2d 554, 558 (11th Cir. 1987). Here, both circumstances exist. The Pages are not detached professionals who rendered disinterested services to the Ecuadorian Plaintiffs. Quite the contrary: they are alleged to have proactively assisted in a broad fraudulent effort engineered by their direct employer.[18] In fact, given that the lawyers are alleged to have committed greater misdeeds than any attributed to the clients, the Pages might have a more substantial interest in keeping the documents confidential than do the Ecuadorian Plaintiffs.[19] These circumstances alone would prevent us from calling the Pages "disinterested." Cf. In re

---

[18] Aaron Page remains associated with Donziger, as evidenced by his involvement in the underlying case in New York. See Chevron Corp. v. Donziger, No. 11 Civ. 0691(LAK), 2013 WL 4804192, at *8 (S.D.N.Y. Sept. 9, 2013) (explaining that Donziger "has received additional [legal] assistance . . . [from] Aaron Marr Page").

[19] The Pages may also have a direct and significant pecuniary interest in thwarting Chevron's efforts. Their law former firm stands to receive a contingency fee in the hundreds of millions of dollars if the Lago Agrio judgment is ever collected.

25

Grand Jury Subpoena, 190 F.3d 375, 385 (5th Cir. 1999) (refusing to find a subpoenaed person "disinterested" where the person was a potential target of the underlying action); In re Klein, 776 F.2d 628, 630 (7th Cir. 1985) ("[F]our of the [subpoenaed] lawyers are suspects themselves, and they have every reason to resist disclosure.").

Because the Pages are not disinterested, Naranjo and Payaguaje cannot rely upon Perlman to establish jurisdiction to hear their appeal from the district court's Rule 45 order.

In sum, if Perlman applies at all, it applies only when there exists "a real possibility the third party will not risk being found in contempt and will turn over the subpoenaed documents." United States v. Jones, 696 F.2d 1069, 1071 (4th Cir. 1982). No such possibility exists here. Therefore, the Perlman exception does not apply in this case. Accordingly, we lack subject matter jurisdiction to hear the appeal from the district court's order on Chevron's Rule 45 subpoenas because the finality rule prohibits such an interlocutory appeal.

B.

We next consider our jurisdiction in the appeal from the district court's decision on Chevron's § 1782 application. Here again, we are the only court that could properly hear an appeal from the Maryland district court's decision. The only real

26

question is whether the decision below is considered final, allowing us to hear it.

We have not previously considered whether a decision on a § 1782 application is immediately appealable. But on at least one prior occasion, the Court has reviewed an order granting discovery under that statute without the need for a contempt sanction. See generally In re Letter of Request from Amtsgericht Ingolstadt, Fed. Republic of Germany, 82 F.3d 590 (4th Cir. 1996). "[W]hile we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed sub silentio, neither should we disregard the implications of an exercise of judicial authority assumed to be proper in previous cases." Washlefske v. Winston, 234 F.3d 179, 183 (4th Cir. 2000) (quotation marks omitted).

Every other circuit court that has considered the jurisdictional issue presented here has found subject matter jurisdiction to hear an immediate appeal from an order on a § 1782 application. See, e.g., Heraeus Kulzer, GmbH v. Biomet, Inc., 633 F.3d 591, 593 (7th Cir. 2011); In re Premises Located at 840 140th Ave. NE, Bellevue, Wash., 634 F.3d 557, 566 (9th Cir. 2011); Bayer AG v. Betachem, Inc., 173 F.3d 188, 189 n.1 (3d Cir. 1999). In addition, at least two other circuit courts have found jurisdiction to hear § 1782 appeals related to the very same dispute before us. See In re Application of the

27

Republic of Ecuador, 735 F.3d 1179, 1183 (10th Cir. 2013) (holding that the district court's decision on Ecuador's § 1782 application was a final, appealable decision); Chevron Corp. v. Berlinger, 629 F.3d 297, 306 (2d Cir. 2011) (same as to § 1782 application filed by Chevron).

The reasoning and conclusions in this unanimous body of case law are convincing. In as much as § 1782 applications aid foreign proceedings, we are not concerned with any underlying merits proceeding in the United States. Lacking an "underlying" proceeding, many of the concerns that make us reluctant to review discovery orders on an interlocutory basis disappear. See United States v. Sciarra, 851 F.2d 621, 628 (3d Cir. 1988) ("[T]he phrase 'interlocutory' necessarily implies some underlying proceeding from which the challenged discovery is an 'off-shoot.' The many cases that characterize discovery orders as interlocutory become inapposite, therefore, when there simply is no underlying suit to disrupt. The rationale for requiring a witness to incur a contempt order as a jurisdictional predicate similarly breaks down when there is no central proceeding from which he must be severed.").

Because the § 1782 order is a sufficiently final order, we have subject matter jurisdiction to hear an immediate appeal from a district court's order granting discovery under that statute. We accordingly proceed to the merits of that appeal.

28

III.

"Section 1782 affords the district courts wide discretion in responding to requests for assistance in proceedings before foreign tribunals." Al Fayed v. United States, 210 F.3d 421, 424 (4th Cir. 2000) (quotation marks omitted). On appeal, we generally review a district court's order under that statute using the familiar abuse-of-discretion standard. Amtsgericht Ingolstadt, 82 F.3d at 592. "A district court abuses its discretion by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." Scott v. Family Dollar Stores, Inc., 733 F.3d 105, 112 (4th Cir. 2013).

A.

Page[20] first argues that the magistrate judge determined that his claimed privileges had been waived before the privilege-related issues were ripe. Page says that it was too early to decide these issues because (1) the subpoena had not yet issued and (2) neither the Pages nor the Ecuadorian Plaintiffs had yet raised any privilege objections.

---

[20] For simplicity's sake, we refer only to Aaron Page when discussing the appellants' challenges to Chevron's § 1782 application. The Ecuadorian Plaintiffs join Page in all his arguments, and Daria Page did not appeal in appeal number 13-2028.

29

"Ripeness concerns the appropriate timing of judicial intervention." Cooksey v. Futrell, 721 F.3d 226, 240 (4th Cir. 2013) (quotation marks and internal marks omitted). "Traditionally, we consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Id. (quotation marks omitted). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties"; conversely, a claim is not ripe when "it rests upon contingent future events that may not occur as anticipated." Scroggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (4th Cir. 2013). In addition, a fit case would ideally present "purely legal" issues. Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006). The hardship prong, on the other hand, "is measured by the immediacy of the threat and the burden imposed on the [parties]." Id.

Considering fitness and hardship here, we find that the issues were ripe. The issues presented were largely legal ones that did not depend on future uncertainties. In effect, Page argued as much at the application stage, saying that his privilege claims defeated Chevron's right to issue the subpoena. (See, e,g., J.A.2 803 ("[T]he mere fact that Chevron's proposed subpoena impermissibly and primarily targets discovery of privileged information and other client confidences -- standing

30

alone -- should lead this Court to exercise its discretion to deny in toto Chevron's § 1782 application.").) As for hardship, Chevron demonstrated a need for the discovery in relation to the ongoing proceedings in Ecuador and at The Hague.

Page asserts that the magistrate judge should have waited for him to produce a privilege log before deciding the privileges issues. We disagree. To begin with, Page's present argument strikes us as somewhat disingenuous given that he pressed the magistrate judge to decide the privilege issues without tendering a privilege log. Moreover, the issues were adequately concrete and fully briefed, so the magistrate judge was free to decide them. The § 1782 application sought documents essentially identical to those requested in the Rule 45 subpoenas that the same magistrate judge had earlier considered. (See, e.g., Opening Br. [13-2028] 13-14 (noting parallels between the Rule 45 subpoenas and the § 1782 applications).) The magistrate judge thus had the privilege log from that prior proceeding to aid his decision. The parties and the court below well understood what issues were at play, and the court justifiably refused to delay its decision on those well-defined questions.

### B.

Next, Page contends that the Donziger Waiver should not have defeated his privilege claims and insists that the

31

magistrate judge inappropriately extended the waiver across multiple proceedings.  Page bore the burden as to this argument. See United States v. Bolander, 722 F.3d 199, 222 (4th Cir. 2013) ("The burden rests on the person invoking the privilege to demonstrate its applicability, including the absence of any waiver of it.").

At the end of the day, we need not parse each point that Page raises, as we conclude that the Donziger Waiver's application in the Maryland court served the interests of comity.

The doctrine of comity instructs federal judges to avoid "stepping on each other's toes when parallel suits are pending in different courts."  Smentek v. Dart, 683 F.3d 373, 376 (7th Cir. 2012); see also W. Gulf Mar. Ass'n v. ILA Deep Seal Local 24, 751 F.2d 721, 728 (5th Cir. 1985) (explaining that comity requires federal courts to "exercise care to avoid interference with each other's affairs").  We have invoked the doctrine, for instance, in explaining that a district court was precluded from issuing an injunction that conflicted with another district court's decision in the same matter.  See Ulmet v. United States, 888 F.2d 1028, 1031 (4th Cir. 1989).  The Supreme Court, too, has called upon "federal courts to apply principles of comity" when faced with class certification decisions "addressing a common dispute."  Smith v. Bayer Corp., 131 S. Ct.

2368, 2382 (2011). By applying comity in these and similar circumstances, courts achieve at least two positive results: avoiding "an unnecessary burden on the federal judiciary" and preventing "the embarrassment of conflicting judgments." Church of Scientology of Cal. v. U.S. Dep't of Army, 611 F.2d 738, 750 (9th Cir. 1979); see also Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 488 (1900) (explaining that comity should "secur[e] uniformity of decision[] and discourag[e] repeated litigation of the same question").

Were we to decline to apply the Donziger Waiver in this proceeding, we would significantly undermine the New York court's decisions and potentially spawn conflicting judgments as to the very same subject matter. Donziger was already required in New York to produce all the documents sought here. Not even Page contests that fact. Other than questioning the period to which the Donziger Waiver would apply, Page does not challenge the lower court's reading of the waiver's scope at all.[21] Page concedes, for instance, that Donziger was required to produce documents in his associates' possession, including those now

---

[21] The magistrate judge found that all the documents sought from Page would have been within the scope of the Donziger Waiver and should have been produced in the New York proceeding. And the magistrate judge understood Page to have conceded the issue. (See, e.g., J.A.2 2625-26 ("Mr. Page does not dispute that his documents should have been produced in Mr. Donziger's production.").) Page has not challenged either finding.

33

held by Page. And Page has never identified any specific document that he was required to produce by the Maryland court that was not already subject to production by Donziger in New York. Page nevertheless invites us to deprive Chevron of documents to which it is admittedly entitled under the New York court's decisions, all without ever coming to grips with the fundamental inconsistencies that would result. We cannot accept that invitation, as § 1782 is "a federal statute construed in a federal court system" and the statute's application "must ultimately be uniform." Republic of Ecuador v. Connor, 708 F.3d 651, 657 (5th Cir. 2013).

What is more, the Second Circuit -- a co-equal circuit court -- has affirmed the Donziger Waiver, deciding the same fundamental issue before us today "[a]fter an independent review of the record." Lago Agrio Plaintiffs, 409 F. App'x at 395. Even in less intimately related cases, we often consider whether our decisions fall in line with those of our sister circuits. See, e.g., Nat'l Treasury Emps. Union v. Fed. Lab. Relations Auth., 737 F.3d 273, 280 (4th Cir. 2013); In re Frushour, 433 F.3d 393 (4th Cir. 2005). It seems all the more appropriate to do so here, where the parties are re-litigating an issue pertaining to the same documents and affecting the same parties that were before the Second Circuit. After all, "[c]ourts in [one circuit] should not grant relief that would cause

34

substantial interference with the established judicial pronouncements of such sister circuits." United States v. AMC Entm't, Inc., 549 F.3d 760, 773 (9th Cir. 2008); cf. Colby v. J.C. Penney Co., Inc., 811 F.2d 1119, 1124 (7th Cir. 1987) ("A posture somewhere in between some deference and complete deference is proper when cases in different circuits challenge the same practice of the same defendant.").

To be sure, under the terms of § 1782, Chevron was required to file a separate action when it determined to seek the documents from Page. But that ministerial step should not alter the ultimate obligation to produce the same documents already under a production order. "The same dispute may . . . be framed in formally separate actions . . . [but] later courts tend to adhere to earlier courts for the same reasons that inform general law-of-the-case practices." See, e.g., 18B Charles Alan Wright et al., Federal Practice and Procedure § 4478.4 (2d ed. 2014 supp.). That principle applies well here.

Were we to find otherwise, Donziger could escape his disclosure obligations because of the geographic happenstance of where the responsive documents otherwise under his control were found. Indeed, Donziger might escape all of his New York disclosure obligations by sending the relevant documents to his compatriots in other districts. Yet a partner in a law firm cannot avoid his or her disclosure obligations by foisting the

documents off to an associate who happens to reside in another judicial circuit. And permitting Donziger to do so here would not only "interfere" with the New York court's affairs, W. Gulf Mar. Ass'n, 751 F.2d at 728, but nullify the power of its orders entirely.

We do not countenance that result. Instead, we find comity a compelling reason to affirm the application of the Donziger Waiver in the Maryland proceeding to the documents in Page's possession.[22]

C.

Separately, Page argues that the Donziger Waiver cannot apply to documents created after October 20, 2010 -- the date that the New York district court found waiver. Chevron responds that the Donziger Waiver has no end date.

---

[22] Page suggests that the Maryland magistrate judge "injected himself into the S.D.N.Y. § 1782 proceeding without proper jurisdiction" by deciding that the Donziger Waiver applied. (Opening Br. [13-2028] 35.) We fail to see how this question presents any sort of jurisdictional issue, and Page did not identify how it would. Under former Federal Rule of Civil Procedure 45 (applied by extension in the § 1782 context), the magistrate judge had jurisdiction to determine whether documents lying within his district were to be produced. See, e.g., Haworth, Inc. v. Herman Miller, Inc., 998 F.2d 975, 977 (Fed. Cir. 1993) ("When a party pursues discovery outside the jurisdiction in which its suit is pending, the jurisdiction of the local district court may be invoked to rule on discovery issues in an ancillary proceeding."). As part of that task, the magistrate judge had to consider the privileges tied to those documents and whether the privileges were validly asserted. The Donziger Waiver was directly relevant to that decision.

36

The magistrate judge believed that the Donziger Waiver included a time limit based on the record at the time of his decision:

> As to all of the materials held by Mr. Donziger or in the possession, custody, or control of Mr. Page, that waiver is full. It is complete for all discovery. . . . [But] I cannot find that that subject matter waiver has a prospective effect. I cannot find a waiver to such an extent that it would effectively neuter the assistance of counsel going forward. So I am hoping that is not the prong or the attack that Chevron is attempting to wage here. Otherwise, there would never be any kind of discussions between client and counsel or no opinion, drafts, and things like this. Counsel couldn't be effective. So it is really about past activities.

(J.A.2 2629-30; see also id. 3457-58 ("[P]roduction under the waiver . . . only included discoverable materials through the October 20, 2010 date.").) Importantly, Chevron has not appealed that finding. Hence, we cannot agree with its "no time limit" position in the absence of a cross-appeal, as Chevron seeks a "modification of the judgment." Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc., 718 F.3d 249, 257 n.8 (4th Cir. 2013).

Chevron separately argues that -- whatever the original scope of the Donziger Waiver might have been -- Donziger has extended that waiver by producing post-October 20, 2010 materials in the New York proceeding. As to this argument, however, we are constrained by the record before us, which does not contain evidence that Donziger has disclosed post-October

37

20, 2010 documents. Consequently, neither the Maryland magistrate judge nor the district court found that any post-October 20 disclosure had been made. Instead, the magistrate judge instructed the parties to "look into that a little bit more." (J.A.2 3458; see also id. at 2633 ("I also need to know the date of the last production of Mr. Donziger or any of those persons who are working under him.").) Chevron has attempted to bypass the lower courts on this issue by asking us to make a factual finding regarding post-October 20, 2010 disclosures in the first instance on appeal. We should not and cannot do so. "[A]ppellate courts . . . do not make such factual findings in the first instance." Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 575 (4th Cir. 1995).

Thus, the Donziger Waiver applies to documents created on or before October 20, 2010. Any issue of whether Donziger or any other relevant person has voluntarily produced post-October 20 materials that effected an additional waiver is not properly before us. We take no position on how the district court should resolve that issue should it arise in further proceedings.

D.

In addition to the Donziger Waiver, the magistrate judge and the district court found two other independent bases to permit discovery of the documents for which Page had asserted privileges from disclosure. The magistrate judge found that the

38

crime-fraud exception applied because of Page's involvement in obtaining the allegedly fraudulent judgment in Ecuador. In addition, various voluntary disclosures -- including disclosures to Cabrera -- defeated the privileges that Page asserted by effecting a subject-matter waiver. Having already found a substantial and independent reason to affirm the district court's order in the § 1782 proceeding, we do not address these other grounds and express no opinion on them. See In re Under Seal, 749 F.3d 276, 293 (4th Cir. 2014) ("[T]o obtain reversal of a district court judgment based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect.").

IV.

For the foregoing reasons, we dismiss appeal number 13-1382 and affirm the lower court's judgment in appeal number 13-2028.

No. 13-1382 DISMISSED
No. 13-2028 AFFIRMED